SAMSON CORDAGE WORKS v. PURITAN CORDAGE MILLS

(District Court, W. D. Kentucky.    July 3, 1912.)

No. 84.

1. TRADE-MARKS AND TRADE-NAMES (§ 70*)—UNLAWFUL COMPETITION—USE OF COLORED MATERIALS IN MANUFACTURE.

Where complainant, in the manufacture of cordage, used one colored strand, the other strands being of another and uniform color, so as to make spots or check marks on the finished cord or rope where the colored strand came to the surface, such checks or spots did not constitute a mark indicating origin or a distinctive feature of complainant's cordage which could not be appropriated by any other maker, and hence defendant's use of one or more colored strands in its cordage did not constitute unlawful competition; there being no exclusive right in the use of colors in the manufacture of goods.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 81; Dec. Dig. § 70.*

Unfair competition in use of trade-mark or trade-name, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.]

2. TRADE-MARKS AND TRADE-NAMES (§ 95*)—TEMPORARY INJUNCTION—DISCRETION.

Where complainant sued for infringement of an alleged trade-mark, consisting of check marks or spots on cordage resulting from the use of a colored strand in the manufacture thereof, and on being cast in that suit appealed to the Circuit Court of Appeals, and pending such appeal instituted another suit on the theory that defendant's use of a colored

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

strand in its product constituted unlawful competition, the court, in the exercise of discretion, would not grant a temporary injunction restraining defendant's use of such colored strand during the pendency of the appeal.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 108; Dec. Dig. § 95.*]

In Equity. Suit by the Samson Cordage Works against the Puritan Cordage Mills. On motion for a temporary injunction. Denied.

Coale & Hayes, of Boston, Mass., and McDermott & Ray, of Louisville, Ky., for complainant.

Helm & Helm, of Louisville, Ky., for defendant.

EVANS, District Judge. The complainant a year or more ago brought an action in this court in which it asserted its ownership of a trade-mark used in connection with certain sorts of cordage manufactured by it and in which one of the threads or strands used was of a different color from the others, and which thereby made, when the threads were intertwined in the process of fabrication, figures which, for want of a better short name, we called "checks," and which showed themselves spirally around the cord, not indeed as a mark indicating origin, but as a necessary and inevitable result of making cord out of different colored strands. A motion for a temporary injunction in that case was denied upon reasons briefly stated in an opinion reported in (C. C.) 193 Fed. 274. On final hearing the action was dismissed upon grounds set forth in another short opinion reported in (D. C.) 194 Fed. 573. From the decree dismissing that case an appeal has been prosecuted to the Circuit Court of Appeals, and is now pending and undetermined.

In both of the opinions referred to it seemed well, owing to some things which had been said at the hearing, to state that we expressed no opinion as to whether the matters complained of would constitute unfair trade. We endeavored to emphasize the absence of any opinion upon a question not then involved for the reason that that suit was expressly and exclusively based upon the alleged infringement of a trade-mark.

[1] The complainant now sues to restrain the defendant from alleged unfair competition, and the question which we did not consider in the former case is directly involved in this one. Practically the same arguments have been made in this case as were made in the other. Indeed, the principal claim to the relief now sought is based largely upon the same grounds as those presented in the former suit. Nevertheless, we have given the subject in its new phase a very careful reconsideration, and the result, especially as it concerns the motion for a temporary injunction, is the conclusion that the motion must be denied. In (D. C.) 194 Fed. 573, 574, we said:

"In manufacturing cordage the complainant combines as many threads or strands as may be desired. One of these is of a color different from all the others which are of a uniform color. The process of fabrication by twisting and intertwining these strands into cord and the regular appearance of spots on its surface as the result of the process were described in

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the former opinion. It will suffice now to say that in this way striking and probably decorative spots are made to appear on the surface of the cord— a red spot, if a red strand is used, and so on through the list of colors. The complainant insists that it may in this way appropriate all the colors for trade-mark purposes. As has been done time out of mind in making cordage by others, one thread of a different color from the others is used by the complainant. In the process of fabrication the colored thread, as the strands are twisted, makes spots of its own color on the surface of the cord. All this is part of the cord itself and cannot be regarded as a 'mark,' arbitrary in character, within the meaning of trade-mark law. It is an inherent and necessary result of the fabrication of a rope out of strands of different colors, and hence cannot be a trade-mark. Many cloth fabrics have more or less distinctively colored figures woven into them. These are not regarded as trade-marks but as decorative devices open to all and free from monopoly.

"The line may be a narrow one, but we take it the distinction is this: When an arbitrary mark, not naturally part of the fabric, is in any wise impressed upon it, it may be a trade-mark, if so intended and used, but no spot made on or color imparted to a fabric as the inevitable or natural result of using the material of which the fabric is made can be the basis of a trade-mark, for the reason that the making of the spots thereon or the impartation of the color thereto by the use of appropriate raw material is open to the public generally, and may not be exclusively appropriated by anybody. Any other doctrine would be intolerable.

"The complainant seeks support in the fact that it uses the trade-mark on sash cord; but we think such a limitation, if insisted upon, is immaterial. It may be, too, that, if a trade-mark is not applicable to the genus, it cannot be so as to any species of cordage. However, it is not necessary to rule upon this proposition."

If these views, so far as they concern the rights, respectively, of the public and of the manufacturer to use different colored strands in making cord, be sound, they, to that extent, apply as well to the claim of unfair trade as to that of a trade-mark. If the complainant might make its cordage out of different colored strands, so might the defendant, because what is done by the defendant in this respect is a thing open to the public generally; no one having a right to the exclusive use of any color.

The fallacy of the contention that the "checks" on the cord (or its "dress," as the complainant prefers to call it), made as we have indicated, constitutes a "mark" indicating origin, or a distinctive appearance which can be appropriated by any one maker, is that the "check" is not a "mark" at all within the proper meaning of that word in this connection. Certainly it is not one which is arbitrary in character or which indicates origin, inasmuch as such spots or "dress" would naturally appear when any person used different colored strands in making rope, and therefore would not, per se, indicate that the cord originated with any particular person. Complainant's so-called "mark" or dressing is an inherent part of the fabric itself and inseparable from it. The checks spirally encircling the cord are not fixed upon the fabric as a "mark" or a dressing. They constitute, as spirally arranged, a characteristic variegation necessarily and inevitably given by the use of the materials of which the cord is composed. If, as we hold, everybody may use different colored threads as material in making cord, it must logically follow that nobody can exclusively appropriate

the result, namely, the spots or dressing of different colors which the strands inevitably make in the fabric. To say that you may use different colored strands, but that it is wrongful to thereby make spots, would be quite absurd. To somewhat illustrate the question, suppose, for example, that for 20 years one manufacturer had made and sold all the black hosiery in the market, and then that somebody else chose to make and sell black hosiery also. It would be an astonishing legal proposition to hold that the former could exclude the latter from the use of black thread in making hosiery either upon the ground of a trade-mark or upon that of unfair competition in trade, because black, as a color, cannot be exclusively appropriated by anybody in manufacturing any kind of fabric, and if the color cannot be exclusively appropriated neither, as we have seen, can the "spot" it makes. Such a case is, in principle, precisely analogous to this, unless we may say that the mere use of black threads in making hosiery, per se, indicates origin or that black, which pervades the entire article, is a "mark" upon it. The mere presence of any color in a fabric, particularly of standard fabrics like rope, socks, or cloth, of itself gives no hint of origin or of the manufacturer.

We have thus far considered the case upon the contention of the complainant that its long use of different colored strands whereby the checks made on the surface of its cord were spirally extended around it gave to complainant an exclusive right to do that thing, and have seen that the contention is not sustainable because the defendant, in doing the same thing, exercised a right which was open to all; no one being permitted to appropriate the exclusive use of any color. If this conclusion be sound, it is decisive of the motion because it cannot be unfair to the complainant for the defendant to do what it has both the legal and the moral right to do. Nevertheless it may be well to consider whether the defendant, by what it did in manufacturing cord out of different colored strands and putting it on the market or otherwise, intended to represent to the public that its goods were those of the complainant, or whether we can clearly infer from the testimony that the defendant has been guilty of such deceitful representations or such perfidious dealings in respect to cordage as entitles complainant to the relief it seeks, remembering while doing so the established rule that nothing less than conduct tending to pass off one man's merchandise as that of another will constitute unfair competition. Edward Hilker Mop Co. v. United States Mop Co., 191 Fed. 618, 112 C. C. A. 176, and cases there cited.

Speaking generally, those just indicated are the grounds for relief in such cases, and they must be established by proof. Each of the parties makes a cord which has spots upon it as the result of the use of different colored strands, and the testimony shows that each of them puts up its cord, and especially its sash cord, about which this litigation centers, in hanks or coils containing usually about 100 feet. Completely around the center of each of its hanks or coils the complainant wraps a label about four inches wide, the ends of which are

sealed together so as to fasten them securely. This label is made of white paper. The printed matter on it is in red or black letters and its borders are red. One of them is now inserted and is as follows:

# SAMSON
## CORDAGE ⚛ WORKS.

(Registered in U. S. Patent Office)

**SOLID BRAIDED**

# WINDOW SASH CORD.

**1200** *Feet.* *No.* **8**

**For weights of not over 20 lbs.**
**Smallest pulley allowable 2 in. diam.**

# SPOT CORD
(REGISTERED IN U. S. PATENT OFFICE)

## WARRANTED FREE FROM IMPERFECTIONS

The Spots on the cord are our

### TRADE MARK

and guarantee of quality.

## SAMSON CORDAGE WORKS,

Solo Manufacturers,    Boston, Mass.

197 F.—14

In the plainest way this label speaks for itself, and shows exactly the contents of the hank it encircles.

Completely around the center of each of its hanks the defendant wraps one or the other of the two different labels (each a little over four inches in width) which it uses thereon according to its classification of its cord. The ends of these labels are also sealed together so as to fasten them securely around the hanks. One of these labels has a very conspicuously dark blue background for the white or red lettering and trade-mark on its face, and a copy of it is as follows:

The other of them has an equally conspicuous and striking background of a bright but lighter blue color for a different lettering and a different trade-mark.  It is as follows:

We understand this latter label is not used except for the cord made for one large wholesale customer.

Each of these labels speaks in the plainest terms and tells exactly what it encircles.  With these precautions taken by the defendant to distinguish its cord from that of the complainant we have not been able to see how any reasonably prudent person could be deceived as

to what he was buying, unless he was grossly careless. Nor can we perceive the equity of compelling the defendant to desist from exercising its right of using strands of different colors in making cordage, because careless persons will not read the plainest possible statement staring them in the face, showing them as clearly as human language can that the cordage he is buying is not Samson's "spot" cord or Samson's cord of any kind. But it is suggested that the labels may be easily torn off and removed. This is no more true of those of the defendant than it is of those put on by the complainant, for each is made of strong paper and put on the hanks in the same way. There is, however, nothing to show that it is the intention of the defendant that they shall be removed until that is done by the ultimate purchaser, nor are we at liberty to found a decree upon the imagination that it is defendant's desire or purpose that that shall be done. As there is no sufficient testimony to the contrary, we must assume that the defendant's purpose is a fair one, and this is emphasized by the fact that, having the right to use every color and to make its cord just as it is made, the defendant is under no obligation to the complainant to put on labels of any sort. Its doing so at all indicates a spirit of fairness rather than unfairness.

It was indeed shown at the hearing that certain dealers had deceived some of their customers who, probably, were the ultimate purchasers, by palming off upon them as complainant's cord some cord made by the defendant; but that, we think, must be a matter between the dealer and his customer in an action for deceit. The possibility that falsehoods may, in special instances, be told by dealers, does not diminish the force of what we have said.

[2] Without pursuing the matter further, we conclude that there are two grounds upon either of which we should overrule the pending motion. The first and principal one is that the complainant, for the reasons we have stated, does not seem to be entitled to it on the merits. The second one is that, if we have any discretion in the matter of granting temporary injunctions, it should, in this case, be exercised against the motion, because the complainant has in the former case elected to sue to establish the validity of its trade-mark and from the decree in that case has taken an appeal to the Circuit Court of Appeals, which is still pending. Should the judgment in that case be reversed, complainant's trade-mark would be established, and this suit seeking relief upon the ground of unfair trade would be wholly unnecessary.

We think, for the purposes of this motion, that the complainant should have stood by its election originally made until the first suit was finally disposed of.