**SAMSON CORDAGE WORKS,**
Complainant,

v.

**PURITAN CORDAGE MILLS, Defendant.**
No. 84.

United States District Court
W. D. Kentucky,
at Louisville.

Jan. 7, 1964.

On Motion for Reconsideration
Sept. 29, 1964.

John Tarrant, Thomas W. Bullitt, Bullitt, Dawson & Tarrant, Louisville, Ky., W. R. Hulbert, William W. Rymer, Fish, Richardson & Neave, Boston, Mass., for complainant.

Charles Speed Gray, Glenn L. Schilling, Dougherty, Schilling & Gray, Louisville, Ky., John Marshall, Jr., Marshall, Cochran, Heyburn & Wells, Louisville, Ky., for defendant.

SHELBOURNE, District Judge.

This suit in equity charging unfair competition was filed originally in this Court on June 4, 1912. On March 7, 1963, the complainant filed a motion for issuance of an order to show cause and for a contempt judgment against the defendant. The motion and statement attached thereto alleged the defendant's violation of the provisions of an injunction entered by this Court on October 27, 1914. The Court issued an order to show cause why the defendant should not be held in contempt on April 4, 1963. The parties filed affidavits and briefs, and the Court heard oral argument of counsel for the parties on September 27, 1963.

Upon consideration of the record in this case, the affidavits and exhibits, and the briefs filed by counsel, the Court makes the following findings of fact and conclusions of law.

FINDINGS OF FACT

(1) June 4, 1912, the complainant filed a bill of complaint against the defendant alleging unfair competition by reason of the defendant's manufacture and sale of sash cord with colored spots arranged spirally about the cord. The complainant alleged that the spots as arranged on sash cord manufactured by defendant simulated the spots which complainant had adopted in 1893 to indicate the source and origin of its top grade sash cord.

(2) The complainant appealed from this Court's denial of its motion for a temporary injunction. D.C., 197 F. 205. On January 13, 1914, the Court of Appeals for the Sixth Circuit reversed the denial of the temporary injunction and ordered the issuance of an injunction restraining, pending a final hearing on the merits, from making, marketing, or advertising sash cord in any way tending to mislead the public into believing the cord made or sold by it was complainant's product. Samson Cordage Works v. Puritan Cordage Mills, D.C., 211 F. 603, 611 (1914).

(3) After a final hearing on October 10, 1916, this Court entered its decree adjudging the defendant guilty of unfairly competing with the complainant and confirming the injunction issued in accordance with the opinion of the appellate court in Samson Cordage Works v. Puritan Cordage Mills, supra. Upon defendant's appeal, the final decree of

this Court was affirmed, per curiam, and the mandate of the Sixth Circuit Court of Appeals was filed and entered in this Court on July 5, 1917.

(4) The permanent injunction granted and affirmed as the result of complainant's suit is still in full force and effect. It has in no way been modified, amended, or in any way impaired and remains fully binding upon the defendant.

(5) The injunction perpetually enjoined the defendant, Puritan Cordage Mills, from further infringing upon the rights of the complainant, Samson Cordage Works, as alleged in its bill of complaint. Defendant was especially enjoined from employing or using spots arranged spirally about cord made or sold by it, including blue spots, from advertising said cord for sale, and from making, marking, advertising, or marketing cord made in any way whatsoever tending or calculated to deceive the public into believing that the cord made or sold by it is the cord made by the complainant.

(6) Defendant recently has manufactured and marketed braided cords of polypropylene and polyethylene in sizes usually identified by the industry as "sash cord." One type of cord, which defendant calls "crabline" and "trailer winch rope", consists of numerous strands of yellow fibers braided with a single strand of black fibers in such a way that spirally arranged black spots appear against a yellow background. Another type of cord manufactured by defendant is made with white polypropylene fibers braided with a single strand of blue fibers. The yellow cord with black spots was marked with labels identifying defendant as the manufacturer; however, the blue-spotted white cord made by the defendant has been sold on reels bearing no identification as to source except that retail sales were made by Coast-to-Coast Stores.

(7) Complainant manufactures and markets a white polypropylene cord with blue spots which is indistinguishable from the blue-spotted cord made by the defendant. Since 1893, complainant has sought to identify its best quality sash cord by braiding therein a single colored strand to produce spots in a spiral pattern along the cord's surface. The same pattern of spots has been used by complainant continuously up to the present as a mark of the source of the cord. In advertising such cord in trade and retail publications, complainant has illustrated its spot pattern and referred to its product as "Spot Cord."

(8) A tightly braided cord within the size limits useful as window cord, whether made of cotton or synthetic fibers and whether sold especially for hanging window sashes, is referred to in the industry as "sash cord". The term "sash cord", therefore, applies to the spotted cord manufactured and sold by the defendant as "crabline" and "trailer winch rope."

(9) Except for the difference between the use of synthetic fibers instead of cotton fibers and the employment of black spots on a yellow background, the "crabline" and "trailer winch rope" manufactured and sold by defendant at the present time more closely resembles complainant's cord than the cord made by defendant in 1911.

(10) In 1914, this Court enjoined defendant from the further manufacture and sale of cord made by braiding two colored strands with undyed strands and producing an effect which the defendant characterized as a "broken spiral". By using one colored strand instead of two at the present time, defendant achieves a pattern of spots identical to the pattern appearing on cord manufactured by complainant.

(11) The use of colored strands of fiber in its manufacture in no way affects the quality, strength, or utility of the cord. The spiral arrangement of contrasting spots is a purely non-functional feature of such cord. The defendant would not in any way be prevented from fairly competing with complainant if the injunction is applied to cord manufactured with synthetic fibers as well as cotton. The injunction does not enjoin the use of colored strands to produce a continuous spiral marking or some other

pattern which is clearly distinguishable from the spiral spot arrangement used by complainant to indicate that cord so marked is made by it.

(12) When the defendant elected to manufacture and sell braided synthetic cord bearing a pattern of spots identical to the pattern on complainant's synthetic cord, its officers and attorneys were aware of the injunction enjoining them from manufacturing cord in any way whatsoever tending or calculated to deceive the public into believing that the cord made or sold by the defendant is cord made by the complainant. Or, if they were not aware of the injunctive provisions, they have persisted in the manufacture of such cord and its sale after receiving notification thereof from the complainant.

(13) There is a definite likelihood that the public will be deceived or confused if the defendant is allowed to make and sell sash cord bearing the identical or a similar pattern of spots as that employed by the complainant. Confusion will result whether or not such cord is packaged so as to display defendant's name or trademark since the package is removed by consumers before use. The defendant cannot prevent retail dealers from removing all identifying labels before displaying the merchandise for sale and, in cases where the cord is sold from reels, the end labels may be concealed from view.

## CONCLUSIONS OF LAW

In an effort to avoid the scope of the injunction as written, defendant contends that the decree must be read in the light of the issues and purposes for which the suit was brought. Terminal Railroad Assoc. v. United States, 266 U.S. 17, 19, 45 S.Ct. 5, 69 L.Ed. 150 (1924). Based on this rule, the defendant's argument is directed against complainant's interpretation of the injunctive provisions.

Defendant argues that, since the injunction was granted on a secondary meaning theory, its provisions must be read in the light of the secondary meaning which the complainant established in the original suit. Defendant maintains that complainant did not prove that a secondary meaning attached to the spiral pattern of spots but had only shown that the spotted sash cord manufactured by it had acquired a secondary meaning. If the cotton cord with spots and not the spot pattern itself had acquired a secondary meaning, the injunction can only apply to cotton cord and not to cord made of some synthetic material. There appears to be a fallacy in this aspect of defendant's argument. Since the law of unfair competition evolved in conjunction with trademark law rather than patent law, the doctrine of secondary meaning is limited to the protection of words, marks, symbols, designs, and physical attributes recognized by the public as indicating the source of a product; it does not extend to protection of the product itself. See Rymer v. Anchor Stove & Range Co., 6 Cir., 70 F.2d 386 (1934); Upjohn Co. v. Wm. S. Merrell Chemical Co., 6 Cir., 269 F. 209 (1920); G. & C. Merriam Co. v. Saalfield, 6 Cir., 198 F. 369 (1912). If complainant had merely sought to prevent defendant from copying its cotton sash cord, relief would have been denied. However, complainant sought relief on the ground that a secondary meaning had attached to the spiral spot pattern on its cotton cord.

Defendant now maintains that the spot pattern acquired a secondary meaning only when it appeared on cotton sash cord. Although the previous record in this action contains frequent references to cotton sash cord, a fair reading of the pleadings, testimony, and court opinions indicates that the issue was not limited to the use of spots on cotton sash cord alone. The complainant sought relief from the defendant's employment of a spot pattern which, because of its similarity to the pattern on complainant's cord, caused the buying public to be deceived or confused as to the source of such spotted sash cord. At that time, sash cord was made with cotton fibers but a mere change in the raw material

used in manufacture does not alter the fact that defendant's synthetic cord is identifiable and usable as sash cord. To read the injunction as enjoining anything less than the defendant's use of a spiral spot pattern on sash cord requires an impairment of the unambiguous language and manifest intent of the court's decree.

■■ The Court is aware of the admonition in numerous decisions in contempt proceedings for the enforcement of a decree that the meaning of the decree should not be expanded by implication or inference beyond the fair meaning of what was intended to be prohibited in the light of the issues. Whatever the decision of this Court might have been if the decree had been otherwise phrased, the Court is nonetheless bound by the plain intent of the decree as written. Lustgarten v. Felt & Tarrant Mfg. Co., 3 Cir., 92 F.2d 277 (1937). Considering the decree in its entirety, the Court concludes that its plain intent is to restrain the defendant from competitive practices in the use of spots on sash cord which are likely to cause confusion in the sash cord industry and deceive retail purchasers.

When defendant's restrictive interpretation of the injunction is viewed in the light of decisions in cases dealing with unfair competition, it becomes apparent that the Court did not intend to circumscribe the injunctive relief granted by limiting its application to sash cord made with cotton fiber only.

In Singer Mfg. Co. v. Golden, 7 Cir., 171 F.2d 266, the court took note that it was deciding a contempt case based upon the order as written and not as it might have been written. The order sought to stop the defendants from "Advertising, offering for sale, or selling as 'Singer parts' or 'Genuine Singer parts' any sewing machine parts not manufactured by The Singer Manufacturing Company." While the injunction was in force, the defendants substituted other parts for Singer parts when the latter were ordered and argued that their conduct did not violate the order because a note at the bottom of each invoice warned the customer in effect that a substitution might have been made. The appellate court held "the decree was clearly susceptible of the construction that it enjoined the defendants from engaging in their method of substitution." The opinion further stated:

"Only the court's decree and the defendants' conduct are before us in this case for contempt. There is no question here of what the court might have provided or intended to provide. The only question we have is *what the court did provide.*"

In the instant case, the injunction as written is clearly susceptible of the construction that it enjoined the defendant from further use of a spiral spot pattern on sash cord regardless of the raw material used in its manufacture. This case differs from the Singer case, where the defendants tried to escape the ambit of the order by modifying their conduct, in that the defendant here seeks safety on the ground that it has modified its product.

■ It is elementary in the law of unfair competition that a change in the offending product which does not lessen the chance of buyer deception or confusion fails to save a defendant from violation of the decree.

In Bowdil Co. v. Central Mine Equipment Co., 8 Cir., 216 F.2d 156 (1954), the district court's modification of a decree that originally enjoined the defendant from making and selling cutting bits used in plaintiff's machine which had the general appearance of bits made by the plaintiff was reversed. The defendant sought modification of the decree on the ground that plaintiff, by discontinuing manufacture of the exact bit in issue during the original suit, abrogated any secondary meaning which had attached to its configuration. The appellate court held that the plaintiff's discontinuance of making the true diamond-shaped bit, standing alone, was not a circumstance justifying modification of the injunction. The decision was based on the ground that the defendant's so-called "true or

pure" diamond-shaped bit was as susceptible of being used in unfair competition with the plaintiff as the cutting bit with side bands, since it was apparent that all bits which were adapted to fit plaintiff's machine would be indistinguishable with respect to their origin. Although the facts of the Bowdil case do not coincide with those of the present case, it is clear that the courts will not permit a defendant to circumvent the provisions of an injunction by changing a product so that the modification in no way substantially lessens the likelihood of deception or confusion.

The defendant here admittedly has not changed the configuration of sash cord but has substituted a new synthetic fiber for natural fibers. Nothing in the record tends to show that former purchasers of complainant's cotton cord will not be deceived into believing that defendant's synthetic cord is also made by the complainant. In fact, since complainant also makes a spotted synthetic cord and the spot pattern now used by the defendant is identical to complainant's, the likelihood of deception is increased.

■ However, defendant contends that the uses of sash cord have changed so greatly since 1914 that most purchasers at present do not regard a spiral spot pattern as an indication of source. In other words, it is claimed that complainant should not be required to carry the burden of proving that its spot pattern has a secondary meaning in today's expanded market. The defendant, in effect, is asking this Court to excuse a comtempt because the injunction is too old. This argument attacks the wisdom of equitable relief by permanent injunction and is without merit. If the defendant believed that the spot pattern had lost its secondary meaning, the proper procedure was to seek modification of the decree. The defendant was acting at its peril by adopting another course of conduct. Lustgarten v. Felt & Tarrant Mfg. Co., 3 Cir., 92 F.2d 277 (1937).

It should be noted that due protection of complainant's rights, based on the secondary meaning attached to its spot pattern, requires that a competitive business once convicted of unfair competition with regard to use of a spot pattern thereafter should be required to keep a safe distance from the borderline separating compliance from contempt. Defendant must do more than see how close it can come with safety to that which it was enjoined from doing even if such requirement involves a handicap as compared with businesses which have not been guilty of unfair competition. Independent Nail & Packing Co. v. Stronghold Screw Products, Inc., 7 Cir., 215 F.2d 434 (1954); Eskay Drugs, Inc. v. Smith, Kline & French Laboratories, 5 Cir., 188 F.2d 430 (1951); Broderick & Bascom Rope Co. v. Manoff, 6 Cir., 41 F.2d 353 (1930).

In its effort to have this Court try the issue of secondary meaning de novo, the defendant quotes some general language from the district court's opinion in Star Bedding Co. v. Stix, Baer & Fuller Co., D.C.Mo., 133 F.Supp. 704 (1955), aff'd. sub. nom., Star Bedding Co. v. Englander Co., 8 Cir., 239 F.2d 537 (1957). The facts of that case, involving trademark infringement, are inconsistent with the circumstances here, and the language quoted merely provides, in effect, that the plaintiff must carry the burden of proving that the defendant's conduct infringes the trademark rights of the plaintiff. The plaintiff in that case made no effort to show that the use of a star symbol was likely to cause confusion or mistake under the circumstances. The decisions in the district and appellate courts were based on the fact that use of the star symbol was not a "colorable imitation" of the plaintiff's trademark. There was no evidence that use of a star symbol on mattress covers was likely to cause deception of purchasers as to the origin of the goods.

■■ In the case before this Court, the defendant's imitation of the complainant's spot pattern is sufficient to justify an inference that confusion and deception are the likely results. Where there is no reason for a resemblance except for the purpose of misleading, the

courts will infer that the resemblance was adopted for that purpose. The question is whether there is a tendency and probability of deceiving at least a part of the public rather than whether there has been actual deception. U-Drive-It Co. v. Wright & Taylor, 270 Ky. 610, 620, 110 S.W.2d 449 (1937). The Court concludes that complainant has sustained the burden of showing facts from which an intent to deceive may reasonably be inferred. Socony-Vacuum Oil Co. v. Oil City Refiners, 6 Cir., 136 F.2d 470, 474 (1943); Kellogg Toasted Corn Flakes Co. v. Quaker Oats Co., 6 Cir., 235 F. 657, 664 (1916). The Court, therefore, concludes that the defendant stands in civil contempt of this Court for violation of both the letter and the spirit of the injunction.

Counsel for complainant, upon notice to counsel for defendant, will tender judgment in conformity with the foregoing findings of fact and conclusions of law.

### On Motion for Reconsideration

This suit is before the Court on defendant's motion to set aside the judgment entered herein on January 28, 1964, and to reconsider the conclusions of law entered January 7, 1964. Counsel for the parties submitted memoranda in support of and in opposition to the motion, and the Court heard oral argument of counsel on June 8, 1964.

In support of its motion, defendant cites Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 and Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669, companion decisions handed down by the Supreme Court on March 9, 1964. At page 232 in the Sears decision, 84 S.Ct. at page 789, the Supreme Court said:

"* * * mere inability of the public to tell two identical articles apart is not enough to support an injunction against copying or an award of damages for copying that which the federal patent laws permit to be copied. Doubtless a State may, in appropriate circumstances, require that goods, whether patented or unpatented, be labeled or that other precautionary steps be taken to prevent customers from being misled as to the source, just as it may protect businesses in the use of their trademarks, labels, or distinctive dress in the packaging of goods so as to prevent others, by imitating such markings, from misleading purchasers as to the source of the goods. But because of the federal patent laws a State may not, when the article is unpatented and uncopyrighted, prohibit the copying of the article itself or award damages for such copying."

The above holding does not change the law applicable to the present suit. The injunction involved here was not directed against defendant's copying of complainant's product itself. As this Court noted in its conclusions of law, relief would have been denied if complainant had merely sought to prevent defendant from copying its sash cord. Injunctive relief was granted originally because it was shown that the spiral pattern of spots embedded in the surface of the sash cord had been adopted by the complainant as a distinctive trade dress to indicate source, and that such spot pattern had acquired a secondary meaning. Having established the fact that a secondary meaning attached to the spiral spot pattern when it appeared on the sash cord, the complainant was entitled to protection in the exclusive use of its trade dress.

The fact that the spot pattern of necessity becomes an integral part of the product itself makes this a borderline case between the copying of a product's design and the copying of a product's trade dress. After a full adjudication of that issue between the parties here, it is not for this Court to say now that the injunction prohibits the copying of an unpatented article. The product involved is sash cord, and the defendant can make sash cord which is identical in physical qualities and has the same configuration

as that produced by complainant. What defendant may not do under the injunction is decorate its cord with a spiral spot pattern in imitation of the markings on complainant's product.

Having considered the holding and the language of the opinions of the Supreme Court in the Sears and Compco cases, supra, this Court concludes that defendant's motion should be denied and

It is ordered that defendant's motion to set aside the judgment of contempt and reconsider the conclusions of law entered herein be and same hereby is overruled.